[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 16-10785 and 16-16805
Non-Argument Calendar

_____

D.C. Docket No. 2:13-cv-01460-LSC

MICHAEL WAYNE EGGERS,

Petitioner - Appellant,

versus

STATE OF ALABAMA,

Respondent - Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(December 5, 2017)

Before HULL, MARCUS and WILSON, Circuit Judges.

MARCUS, Circuit Judge:

At issue in this capital case is whether Michael Wayne Eggers, an Alabama

death row inmate, is competent to waive his right to appeal from the denial of his §

2254 federal habeas petition, to discharge counsel and proceed with execution.

Eggers admitted to having beaten and choked to death Bennie Francis Murray, his former employer, because she slapped him during an argument and because he felt betrayed by her refusal to help him fetch his disabled car from a remote location. On August 5, 2013, Eggers filed a pro se federal petition for a writ of habeas corpus in the United States District Court for the Northern District of Alabama, challenging the validity of his convictions and sentence. Counsel was appointed to represent him. Throughout the § 2254 proceedings, Eggers disagreed with his counsel's litigation strategy, sought to have different counsel appointed, and asserted claims for habeas relief in his own voluminous pro se filings.

After his counsel filed a notice of appeal from the district court's denial of his § 2254 petition, Eggers filed recurrent pro se requests to withdraw the appeal, discharge counsel and be executed. At counsel's request, the district court conducted a mental health hearing on Eggers's competency to waive his appeals, and this Court stayed the appeal in order to allow the district court to complete its inquiry. After taking extensive testimony from two psychologists and Eggers himself, in addition to examining voluminous documentary evidence bearing on Eggers's competency, the district court concluded that Eggers was mentally competent and had made a rational choice to forego further collateral review, dismiss his attorneys, and proceed to execution. Thus, it granted Eggers's

2

application to withdraw his appeal from the denial of his § 2254 petition and discharge counsel.

A second notice of appeal was then filed by his counsel challenging the district court's competency ruling too. In light of the petitioner's expressed choice to dismiss all appeals, discharge counsel and proceed with execution, we are obliged to address the ancillary issue of Eggers's competency before turning to the merits of this habeas appeal. To that end, we have obtained briefing from the State, Eggers himself and his counsel to resolve this threshold matter. After review of a lengthy record, we are satisfied that the district court engaged in a thorough and comprehensive analysis of the record and acted within its discretion in finding that the petitioner was competent to proceed as he saw fit and rationally chose to abandon his federal habeas appeal. We can discern no clear error in this determination and, thus, affirm the judgment of the district court and dismiss this appeal.

## I.

### A.

In order to properly address the matter of competency, we briefly recount the essential factual and procedural history surrounding this case. The underlying facts were summarized by the Alabama Court of Criminal Appeals this way:

> Bennie Francis Murray ("Francis") and her husband, Frank, owned and operated a concession business that traveled around the southeast

3

with a carnival.  Francis hired Eggers to work concessions; he traveled with the carnival until September 2000, when the carnival arrived in Jasper, [Alabama,] where Eggers met a woman.  When the carnival left Jasper, Eggers stayed behind and found a job, but apparently lost the job at some point and was unable to find another one.  On December 26, 2000, Eggers telephoned Francis, who, along with her husband, lived in Talladega when they were not traveling with the carnival, and asked for a job.  Francis explained that the carnival would not begin traveling again until mid-March and that the Murrays' "bunkhouse," a trailer that had been converted into rooms for their employees, would not be available until mid-February.  On December 28, 2000, Eggers telephoned Francis again.  He told Francis that he and his 15-year-old son were at the bus station in Birmingham, and asked Francis to come pick them up.  Francis picked up Eggers and his son and brought them back to Talladega, where she tried to help Eggers find a temporary job, but was unable to do so.  On December 30, 2000, Eggers asked Francis to take him and his son back to Jasper; she agreed.

According to Eggers's statements to police, on their way to Jasper, Eggers asked Francis to take him to his car, which was outside Jasper; he had driven it off the road in inclement weather the week before Christmas and had gotten stuck in a ditch.  Francis agreed and, after dropping off Eggers's son at Eggers's apartment in Jasper, Francis and Eggers left in search of Eggers's car.  After driving for some time in a rural area of Walker County, Francis stopped her pickup truck on the side of the road and indicated that she was unwilling to go any further and was going to turn around. Eggers then asked her if she was "joining everyone else on the fuck Mike bandwagon."  At that point, Eggers said, Francis "backhanded" him and he "let go . . . [and] just started hitting her."  Eggers beat Francis with his fists until she was unconscious, at which point he pushed her as far against the driver's side door of the pickup truck as he could, and drove down a nearby dirt road.  When Francis started to regain consciousness -- "[s]he was making noises and stuff like that" -- Eggers stopped the truck and pushed her out of the cab of the truck onto the road.  Eggers got out of the truck and started cursing at Francis and kicked her several times in the head with the steel-toed boots he was wearing.  Eggers then got back in the truck, drove toward the end of the road and turned around, but decided to stop where he had left Francis because he wanted to

4

make sure she was dead and "wasn't going to stay out there suffering."  When Eggers stopped, Francis was starting to regain consciousness so he kicked her again and choked her with his hands "to make sure she was dead."  Eggers again said that he "didn't want to leave her out there suffering."  Eggers then dragged Francis into nearby woods where she could not be seen from the road and, because he believed she was still alive at that point, he put a tree limb on her throat and stood on it in an effort to kill her.  Eggers then took Francis's truck to a car wash and washed Francis's blood out of the cab of the truck. He also went through Francis's purse, which was in the truck, and found cash and a debit card.  Eggers said that the killing was not premeditated, but was spontaneous.

 [Eggers eventually was arrested in Florida and brought back to Alabama for criminal proceedings.]

Eggers v. State, 914 So. 2d 883, 888-89 (Ala. Crim. App. 2004) (citations omitted).

Trial began in August 2002.  Id. at 890.  During trial, Eggers's counsel had him evaluated by a psychologist in an effort to establish that he was not guilty by reason of insanity.  Id. at 890, 912-13.  Although Eggers pleaded not guilty and not guilty by reason of mental disease or defect, and although the jury was charged on the defense of insanity, Eggers did not argue, nor present evidence denying that he killed Francis or that he was insane at the time of the crime.  Id. at 890.  Rather, the petitioner claimed that he suffered from intermittent explosive disorder and personality disorder, that the initial attack on Francis was the result of blind rage precipitated because Francis slapped him and that the ensuing kidnapping and robbery were merely afterthoughts unrelated to the homicide.  Id.

5

The insanity defense failed and the jury convicted Eggers of two counts of capital murder. Id. at 888. The homicide was made capital because it was committed during the course of a kidnaping, see Ala. Code § 13A-5-40(a)(1) (1975), and because it was committed during the course of a robbery, see id. § 13A-5-40(a)(2). Eggers, 914 So. 2d at 919-20. The jury recommended that the petitioner be sentenced to death by a vote of eleven to one. Id. at 920. The trial court accepted the jury's recommendation and sentenced Eggers to death. Id. at 921.

Eggers appealed, through new appointed counsel; the Alabama Court of Criminal Appeals affirmed the conviction and sentence. Eggers v. State, CR-02-0170, 2004 WL 2200853 (Ala. Crim. App. Oct. 1, 2004). After Eggers filed an application for rehearing, the Alabama Court of Criminal Appeals substituted its opinion with another on November 24, 2004, also affirming the conviction and sentence, and overruled a second application for rehearing. Eggers, 914 So. 2d at 883. The Alabama Supreme Court initially granted Eggers's petition for a writ of certiorari, but later quashed the petition. The Alabama Court of Criminal Appeals issued its certificate of judgment on May 20, 2005. Eggers subsequently petitioned the United States Supreme Court twice for certiorari review -- a pro se petition and an attorney-authored one. Both applications were denied on January 17, 2006. Eggers v. Alabama, 546 U.S. 1140 (2006).

6

B.

On April 20, 2006, Eggers timely filed a pro se post-conviction petition

pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit

Court of Walker County, Alabama.  At the State's request, the court held a hearing

to determine whether to appoint counsel to represent Eggers.  Right from the

outset, Eggers said that he wanted to proceed without appointed counsel; not

surprisingly, the circuit court denied the State's motion to appoint a lawyer for

him.  Eggers amended his pro se petition five times, filing several procedural and

discovery motions and writs of mandamus; in some of the filings, he claimed that

his capital crime and conviction was, for one reason or another, the result of a

conspiracy against him by the San Bernardino County, California, Sheriff's

Department, the Federal Bureau of Investigation ("FBI"), and elements of

organized crime.  On October 4, 2010, the circuit court dismissed Eggers's Rule 32

petition, holding that Eggers's claims lacked merit, lacked specificity, or were

procedurally defaulted.

On appeal, the Alabama Court of Criminal Appeals appointed counsel to

represent Eggers.  Some months later, counsel moved to withdraw, citing conflicts

with Eggers.  The petitioner likewise notified the state appellate court that he had

"discharged" counsel, in part, because counsel would not sign his "attorney/client

objective agreement" to litigate the appeal the way he wanted to proceed.  When

the Alabama Court of Criminal Appeals denied the motion to withdraw, Eggers's

counsel filed a "no merits" brief, citing Anders v. California, 386 U.S. 738 (1967).

Eggers then filed a pleading raising 1,581 "issues" with the circuit court decision.

The Alabama Court of Criminal Appeals affirmed the dismissal of Eggers's Rule

32 motion on April 20, 2012, writing that it had reviewed the entirety of Eggers's

claims, along with the record, and concluded that the issues had no merit.  On

September 20, 2013, the Alabama Supreme Court denied his petition for writ of

certiorari.

C.

On August 5, 2013, Eggers filed the instant pro se federal habeas petition,

pursuant to 28 U.S.C. § 2254, in district court and sought the appointment of

counsel.  The district court first requested that two known death-penalty litigation

attorneys meet with Eggers about the possibility of representing him, but after the

meeting, Eggers complained to the district court about their strategy and advice.  A

magistrate judge subsequently appointed attorneys from the Middle District of

Alabama Federal Defender Program, Inc. to represent the petitioner.

Eggers originally allowed his appointed counsel, John Palombi and Leslie

Smith, to litigate his § 2254 petition.  Despite many pro se filings from Eggers

complaining about his counsel's litigation strategy, the district court refused to

appoint new counsel, but permitted Eggers to file a pro se amended petition for

habeas relief <u>in addition to</u> the petition submitted by counsel.  Eggers's counsel asked the district court to conduct a competency hearing and declare Eggers incompetent to proceed.  In support, they offered a psychological evaluation of Eggers from Dr. Ken Benedict, a psychologist who had met with the petitioner at Donaldson Correctional Facility on May 22 and 23, 2014, and August 28 and 29, 2014.  The district court denied counsel's motion for a competency hearing on the ground that a hearing would only be required if a death penalty petitioner whose competency was in question sought to dismiss the entirety of his § 2254 petition. Because Eggers had filed pleadings suggesting that he did not want to abandon his federal habeas petition but rather only sought to proceed <u>pro se</u> or with different counsel, a competency hearing was not required.

On November 25, 2015, the district court denied the counseled and <u>pro se</u> § 2254 petitions in their entirety.  The district court fully addressed the claims contained in Eggers's counseled petition -- including that: (1) Eggers was mentally incompetent at trial and during the post-conviction proceedings, and the trial court deprived him of a constitutionally-mandated competency hearing; (2) appellate counsel rendered ineffective assistance; (3) trial counsel rendered ineffective assistance in litigating his insanity defense at trial and his competence to stand trial, in investigating and litigating the claim that Eggers was mentally ill when he confessed, in investigating Eggers's mental illness in order to support a lesser

9

included offense or to show that he lacked the intent to commit capital murder, and in preparing for the penalty phase of the trial; (4) the State withheld evidence concerning Eggers's 1987 arrest and commitment in a mental hospital; (5) the State caused mental health experts to present false testimony that Eggers was not insane; and (6) Eggers was denied counsel during a custodial interrogation.

The district court also thoroughly considered Eggers's pro se claims that: (1) the State withheld evidence concerning Eggers's 1987 arrest and commitment in a mental hospital, and records from the FBI and San Bernardino Sheriff's Department; (2) his arrest and the admission of his confessions were unconstitutional because he was arrested pursuant to an illegal search and seizure and the three confessions he made to law enforcement were involuntary; (3) he was incompetent to stand trial; (4) the trial court erred in addressing his mental illness and incompetency; and (5) his trial counsel rendered ineffective assistance of counsel on various other grounds.  After explaining in detail that the state court had not issued a decision that was either contrary to or an unreasonable application of Supreme Court law, the district court denied Eggers's motions for discovery and an evidentiary hearing, and denied him a certificate of appealability.

On December 22, 2015, Eggers filed in district court a pro se "Motion to Appoint Successor Counsel Who Shall Effectively Waive Future Appeals," seeking leave to "move forward with his state sanctioned execution without any

10

further undue delays."  Soon thereafter, Eggers filed what he characterized as a pro se "Motion for a Final Order," asking the district court to give him a copy of its final order so he could send it to the Alabama Supreme Court "to expedite [his] execution."  Eggers also contemporaneously lodged a pro se "Waiver/Notification/ Motion to Expedite Execution" in the Alabama Supreme Court.  The State responded that it had no objection to the waiver of any appeal.

At that point, and on appointed counsel's motion, the district court agreed to conduct a competency hearing.

### D.

After Eggers's counsel filed a notice of appeal from the denial of his underlying § 2254 petition, we stayed the appeal so that the district court could conduct a competency hearing.  The district court held an extensive hearing, taking testimony from Dr. Ken Benedict, a psychologist retained by counsel; Dr. Glen King, a psychologist retained by the State; and from Eggers himself.  The court also received in evidence, among other things, Eggers's extensive Alabama Department of Corrections ("ADOC") file, Dr. Benedict's psychological evaluation report dated October 17, 2014, and Dr. King's psychological evaluation report dated April 5, 2016.

Dr. Benedict opined that Eggers suffered from schizophrenia, a psychotic spectrum disorder, and possibly from a delusional disorder, as well as a narcissistic

11

personality disorder and a history of substance abuse.  The district court allowed

Eggers to personally question Dr. Benedict, and in that exchange, Eggers

challenged many of the things Dr. Benedict had based his diagnosis on, denied that

he was delusional, explained several of his legal filings, and detailed his

complaints about prison and the courts.  Eggers also explained that he was trying to

establish that while he suffered from psychological problems at the time of the

murder, he was no longer suffering from any of them, he was not delusional and

fully understood the claims he sought to raise on federal habeas review.

Dr. King, retained by the State, testified next.  He opined that Eggers "does

not have a serious mental illness or mental defect and that he certainly is able to

proceed pro se. And he has a rational understanding of courtroom procedures, the

issues in the courtroom, and that he has a rational and reasonable understanding of

what it means to consult with counsel."  Dr. King formally diagnosed Eggers with

narcissistic personality disorder, and observed that the separate diagnoses of a

psychiatrist and psychologist at the time of Eggers's trial in 2002 reached

essentially the same diagnosis as he did.  He explained that a narcissistic

personality disorder "is not considered to be a serious mental illness," and that it is

not a psychotic disorder or a delusional disorder.

Eggers then testified.  The petitioner reiterated his views concerning his

legal proceedings, explained his delusions at the time of trial, and detailed some of

12

the problems he encountered in prison, and with lawyers and the court.  He offered

that if the district court would reopen his case and consider the arguments he had

advanced in a pro se capacity -- not the arguments advanced by his counsel -- then

he might want to continue with his case, but "if you are not going to do that, then

there is no reason for me to even proceed pro se on appeal because you have given

me nothing to appeal except a blanket denial."  He also flatly claimed that he was

competent to decide to forgo any further appeals because

> I have full understanding of all the proceedings.  I mean, I understand
> my claims, I understand what these proceedings are for.  I understand
> that I was convicted of capital murder.  I understand that I was
> sentenced to death.  I understand the appellate process.  I understand
> that I went through the state post-conviction proceedings, state post-
> conviction appeal.  I am in federal habeas corpus.  I tried to get
> counsel who would present my claims.  You have abandoned my
> claims.  You have presented your own claims.  The Judge dismissed
> your claims, ignored my claims.  I don't want to go on to the United
> States Eleventh Circuit or the United States Supreme Court.

Eggers adamantly denied that he was currently delusional or suffering from any

mental disease or defect.

After the hearing, the district court received briefing from counsel, the State,

and Eggers.  Counsel claimed that Eggers was not competent to waive his appellate

rights or undertake self-representation because he suffered from psychotic

delusions, and asked the court to appoint a person as next of friend to prosecute

Eggers's § 2254 appeal.  Before the State's brief was due, Eggers filed two

additional pro se pleadings: a "Pro se Response to Competency Hearing and Brief

in Support Submitted by A/C and State," and a "Summary Argument to Eggers Response to Competency Hearing, Appointed Counsel and State of Alabama." Again, Eggers said that he was competent, that he should be allowed to discharge his counsel and proceed pro se, and that he should be permitted to waive all appeals and proceed immediately to execution. He also reiterated his dissatisfaction with the district court's treatment and ultimate denial of his claims for habeas relief.

Out of an abundance of caution, the district court directed Eggers to file a statement indicating whether (1) he wanted to appeal on any of the grounds he had asserted pro se, or on any other basis, if the court allowed him to discharge counsel and appeal pro se; or whether (2) he truly wished to withdraw his habeas application and waive all future appeals in their entirety. In a May 5, 2016, response, Eggers unambiguously answered that he "simply withdraws and waives all future appeals in their entirety." The State subsequently filed a brief arguing that Eggers was competent to waive all appeals and discharge counsel because he was not suffering from a severe mental illness, was fully aware of his options, and had made a rational choice.

In a lengthy opinion, the district court found that Eggers had made a rational choice to dismiss counsel and abandon his appeal. It also found that Eggers was fully competent to make those decisions and had the right to do so. Accordingly,

14

the district court granted Eggers's pending motions to withdraw his appeal, dismiss counsel and proceed to execution. Following the district court's order, we lifted the appellate stay so that we could address, as an initial matter, counsel's challenge to the district court's finding of competency.

This timely appeal followed.

## II.

The sole issue before us today is the ancillary question of whether Eggers is competent to withdraw his appeal, dismiss counsel and proceed to execution. In Rees v. Peyton, 384 U.S. 312 (1966), the Supreme Court established the operative test for determining competency to waive post-conviction review in a capital case. The Court framed the essential question this way: whether the defendant "has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." Id. at 314. We have since explained that

> "[applying the Rees test] involves a determination of (1) whether that
> person suffers from a mental disease, disorder, or defect; (2) whether
> a mental disease, disorder, or defect prevents that person from
> understanding his legal position and the options available to him; and
> (3) whether a mental disease, disorder, or defect prevents that person
> from making a rational choice among his options." Lonchar v. Zant,
> 978 F.2d 637, 641 (11th Cir. 1992).

Because a defendant may be found incompetent if he satisfies either of the last two prongs of the Lonchar test, we analyze all three prongs.  See id. at 641-42; see also Rumbaugh v. Procunier, 753 F.2d 395, 398-99 (5th Cir. 1985).

Whether Eggers is competent to dismiss his § 2254 habeas petition in order to proceed with execution is purely a factual question.  Ford v. Haley, 195 F.3d 603, 617 (11th Cir. 1999) ("Whether Ford is competent to dismiss his § 2254 habeas petition in order to be executed in a capital case is a factual question." (citing Lonchar, 978 F.2d at 640)).  Not only is the ultimate determination about competency factual in nature, so too are any subsidiary findings.  See Hauser ex rel. Crawford v. Moore, 223 F.3d 1316, 1323 (11th Cir. 2000).  However, to the extent any party claims that the district court misinterpreted Lonchar's three legal requirements, we review those legal questions de novo.  Ford, 195 F.3d at 617.

In examining the district court's factual findings, we are obliged to accept them unless they are clearly erroneous.  Ford, 195 F.3d at 617.  "Clear error is a highly deferential standard of review."  Holladay v. Allen, 555 F.3d 1346, 1354 (11th Cir. 2009) (quotation omitted).  "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Id. (quotation omitted); Ford, 195 F.3d at 617; see also Anderson v. City of

16

Bessemer City, 470 U.S. 564, 573 (1985). In Anderson, the Supreme Court

explained that the clear error standard

> plainly does not entitle a reviewing court to reverse the finding of the
> trier of fact simply because it is convinced that it would have decided
> the case differently. The reviewing court oversteps the bounds of its
> duty under Rule 52(a) if it undertakes to duplicate the role of the
> lower court. In applying the clearly erroneous standard to the findings
> of a district court sitting without a jury, appellate courts must
> constantly have in mind that their function is not to decide factual
> issues de novo. If the district court's account of the evidence is
> plausible in light of the record viewed in its entirety, the court of
> appeals may not reverse it even though convinced that had it been
> sitting as the trier of fact, it would have weighed the evidence
> differently. Where there are two permissible views of the evidence,
> the factfinder's choice between them cannot be clearly erroneous.

470 U.S. at 573–74 (citation and quotation marks omitted). Indeed, it is well

settled that an appellate court may set aside a trial court's findings of fact only if

they are "clearly erroneous," and we must afford "due regard . . . to the opportunity

of the trial court to judge of the credibility of the witnesses." Amadeo v. Zant, 486

U.S. 214, 223 (1988) (quoting Fed. R. Civ. P. 52(a)). In other words, we cannot

substitute our interpretation of the evidence for that of the trial court simply

because we "might give the facts another construction [or] resolve the ambiguities

differently." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 857 (1982)

(quotation omitted).

A.

17

Here, the parties are in basic agreement that the district court did not clearly err in finding that Eggers had satisfied the first step of the Lonchar test and that he had not satisfied the second one.  Again, the first step simply asks whether Eggers suffers from a "mental disease, disorder, or defect."  Lonchar, 978 F.2d at 641. The district court found Dr. King's diagnosis of a personality disorder more persuasive than Dr. Benedict's diagnosis of paranoid schizophrenia.  The court concluded, however, that Eggers still satisfied the first prong of the test for incompetence because a personality disorder constitutes "a mental disease, disorder or defect" in this Circuit.  See Ford, 195 F.3d at 617.  While his counsel maintains that Eggers suffers from paranoid schizophrenia, rather than only from a personality disorder, no party on appeal -- not the State, not Eggers, and not his counsel -- disputes that the first prong of the Lonchar test has been satisfied.

As for the second prong, the district court found that counsel had conceded Eggers understood "his legal position and the options available to him."  The district court added that "perhaps the most persuasive evidence that Eggers understands his legal situation is his own testimony."  See Lonchar, 978 F.2d at 642.  The record fully supports the district court's finding.  In fact, Eggers made it abundantly clear that he understood the legal system, all of the options available to him, and the fateful reality that he will face execution if he is allowed to withdraw his appeal.  This was wholly consonant with Dr. Benedict's testimony that he was

18

not concerned about whether Eggers understood the legal proceedings or that he will face execution if allowed to drop his appeal.

In a letter brief to this Court, counsel speculates, nevertheless, that Eggers might not understand his legal position because he "entertain[ed] filing a Rule 60(b) motion." Yet a review of the record shows that counsel told Eggers that he should file a Rule 60(b) motion. Eggers went on to discuss that possibility in a colloquy with the district court and confirmed that he "absolutely" understood that if a Rule 60(b) motion was filed, it would likely be denied and Eggers would be subject to being executed. The record clearly indicates that Eggers fully understood the legal posture of his case. We add, however, that the petitioner need not understand the particulars of each legal issue. Ford, 195 F.3d at 619. Rather, Eggers must exhibit "a basic understanding of the habeas proceedings" and understand "that without further proceedings he would be executed." Id.; see also United States v. Hogan, 986 F.2d 1364, 1373 (11th Cir. 1993) ("Even perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers. That level of comprehension is not a requirement of competency."). Here, as in Ford, the record established that the district court's findings are supported by substantial evidence and are not clearly erroneous. Ford, 195 F.3d at 619.

B.

That leaves us with the third prong of the <u>Lonchar</u> test -- whether Eggers's mental disease, disorder, or defect prevented him from making a rational choice among his options, <u>Lonchar</u>, 978 F.2d at 641 -- and the essential dispute in this appeal.  After a detailed review of the record, we are left with no doubt that the district court had a solid evidentiary foundation for finding Eggers competent and that he made a rational choice to forego further collateral review.  There is no clear error in these determinations.

The district court also made numerous subsidiary findings of fact bearing on Eggers's competency, all of which were based on an ample record.  For starters, the district court found that Eggers did not suffer from psychotic delusions or paranoid schizophrenia.  In making this finding, the district court first recounted -- and then squarely rejected -- the opinion of counsel's expert, Dr. Benedict.  Dr. Benedict -- who reported that he had testified as a psychology expert in about fifteen death penalty cases, and had always testified on behalf of an inmate -- opined at length at Eggers's competency hearing.

Benedict detailed that in preparing his opinion report, he had spoken with Eggers's family members and friends, and reviewed numerous materials, including a 1987 record from the El Paso, Texas Police Department about Eggers and his brother, David, who had reported being followed by unknown subjects and were

20

described as "not appear[ing] to be mentally stable";[1] a 2001 transcript of Eggers's confession, in which he admitted he killed the victim because "I felt like everybody was on the fuck you bandwagon"; records from the Walker County, Alabama jail while Eggers was awaiting trial and reporting high anxiety; two mental health evaluations conducted during Eggers's trial by Dr. Alan Shealy, a psychologist, and Dr. James Hooper, a psychiatrist; four Alabama Board of Corrections incident reports from 2002-03 about Eggers threatening inmates, attempting to commit suicide and admitting to hallucinations; and three complaints Eggers filed with prison officials in April and May 2014, detailing his concerns that his food was unsanitary and that prison staff were possibly delaying the delivery of his mail.  Dr. Benedict also reported that several of Eggers's family members and friends said Eggers had begun to seem "paranoid" around 1985, when federal officers forced Eggers to become a confidential informant for the San Bernardino Sheriff's Office.  They added that Eggers's brother suffered from paranoid schizophrenia, but most believed Eggers's problems were not as severe as his brother's.

Dr. Benedict's report recounted that he had administered several personality tests in 2014: the Personality Assessment Inventory, or PAI, the Minnesota Multiphasic Personality Inventory–2 ("MMPI-2"), and the Rorschach inkblot test.

---

[1]    Dr. Benedict said that after the incident, the police took Eggers to a psychiatric ward on an emergency hold but that records from the admission no longer existed.

21

Benedict said the PAI, which yields a profile of a person's emotional, social, and behavioral functioning, indicated that Eggers suffered from "extremely high levels of clinical paranoia and persecutory ideas."  According to Benedict, the results of the MMPI-2 also revealed "very high levels of paranoia at levels similar to what was indicated by the PAI."  As for the Rorschach ink blot test, Dr. Benedict said that it showed in some instances thought disorder and self-involvement.

Dr. Benedict's formal diagnosis was that Eggers suffered from a psychotic spectrum disorder, namely schizophrenia, and possibly a delusional disorder, as well as a narcissistic personality disorder and a history of substance abuse.  Dr. Benedict explained that a psychotic spectrum disorder, as listed in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-V"), includes these diagnostic criteria: "hallucinations, delusions, disorganized thinking, catatonic behavior or grossly disorganized behavior . . . and . . . negative symptoms, . . . such as interpersonal withdrawal . . . ."  "Of those five cardinal symptoms, two must be present for a period of at least six months."  Benedict opined that Eggers's "most obvious and consistent [symptom] is the delusional activity that has been in evidence for many years."  He added that Eggers also suffers from "brief episodes of disorganized thinking" and has a "variety of negative symptoms, including interpersonal withdrawal."

22

As for Eggers's delusional activity, the psychologist discussed Eggers's numerous suspicions arising out of having been a confidential informant during his youth in the 1980s in San Bernardino, when he informed on motorcycle gangs and the mafia. According to Eggers, he was under a tremendous amount of stress at the time of the capital murder because of his role as a confidential informant -- stress that may have caused him to commit the murder -- and that, either because of his cooperation with law enforcement, or in spite of it, none of his counsel, trial or otherwise, ever adequately pursued this line of defense, and conspired with the courts to suppress it. As other examples of delusional activity, Dr. Benedict cited Eggers's beliefs that the district court was engaging in ex parte communications with the Supreme Court about his case; that his counsel was withholding information from him and colluding with law enforcement to conceal evidence; that conspirators within the prison were tampering with his food; and that his confession to law enforcement at the time of the murder of the victim was false because an agent of the FBI with knowledge of his prior involvement as a confidential informant in California coerced him into confessing.

Although Eggers denied having hallucinations, the psychologist opined that Eggers's past assertions to correctional officers and accounts from Eggers's family showed otherwise. Benedict explained that he disagreed with Dr. King's diagnosis because Dr. King's opinion was based solely on Eggers's statements and not on

23

collateral interviews.  And while Dr. Benedict opined that Eggers understood that if he dropped his appeal he would face execution, Benedict believed the petitioner's decision was "irrational."

The district court thoroughly summarized Dr. Benedict's testimony and report, but rejected the psychologist's opinion.  In doing so, the district court instead relied on three other mental health professionals, each of whom had formally evaluated Eggers and each of whom had agreed that while Eggers suffered from various types of personality disorders he did not suffer from any severe mental illness.  The district court first pointed to the opinions of Dr. Alan Shealy, a psychologist, and Dr. James Hooper, a psychiatrist, each of whom had evaluated Eggers at the time of his trial in 2002.  Neither diagnosed him as either being psychotic or suffering from any severe mental illness.  Rather, Dr. Shealy, who had interviewed Eggers, his lawyer, and two family members and administered an MMPI-2 and part of an IQ test, diagnosed Eggers with "intermittent explosive disorder" and "paranoid personality disorder."  But, he did not diagnose the petitioner with schizophrenia.  Dr. Shealy noted that Eggers had suffered "one episode of psychotic delusional paranoi[a] at age 20, lasting for weeks to a few months, most likely a result of significant amphetamine abuse combined with a predisposition to mental disorder," and added that Eggers's older brother, David, is an "institutionalized paranoid schizophrenic."  For his part, Dr.

24

Hooper interviewed Eggers and reviewed Dr. Shealy's report. He opined that Eggers "has many characteristics of an antisocial personality disorder," that he "denied any hallucinations or delusions no[w] or ever," and that while he had "been drawn into his brother's delusions in 1985 [he] had no problems since then . . . or at the time of the index crime." Dr. Hooper also found that Eggers "does not suffer from severe mental disease or defect and has not suffered from a serious mental disease or defect."

The district court found these opinions to be consistent with the diagnosis offered by the State's witness, Dr. Glen King, at the competency hearing. Dr. King, a psychologist, began his testimony by relaying that he had been retained by the State in about eighty post-conviction death penalty cases or serious criminal cases. Notably, however, he ultimately testified in favor of the inmate in approximately ten of those cases.

Dr. King met with Eggers at Donaldson Correctional Facility for approximately two and a half hours on April 4, 2016. King administered a test he called the Evaluation for Competency to Stand Trial, Revised Form, or ECST-R. He employed that test because he thought it was the most appropriate one to help answer whether Eggers had a serious mental illness or mental defect and whether that illness or defect affected his ability to make rational decisions about his case and consult with his lawyers. Dr. King described the ECST-R as a structured

interview with three parts: the first dealt with competency to consult with counsel; the second with a factual understanding of courtroom procedures; and the third with a rational understanding of courtroom procedures.  According to King, Eggers scored "basically zeros" on everything, meaning that "he had a perfect understanding of all the roles of participants, the factual understanding of courtroom procedure, and his ability to consult with counsel."  Although Dr. King brought two other tests with him (an MMPI-2 and a test for malingering), he didn't administer either because, in his words, "[w]hen I first met Mr. Eggers and went through approximately a two-hour interview with him, there was absolutely no evidence for any psychological difficulty, no evidence for mental illness that I could see.  He answered all my questions directly, and he also showed no evidence whatsoever for malingering."

Dr. King also opined that during his interview with Eggers, he "saw [no] overt paranoia . . . during any of the time that [he] spent with him."  Eggers denied that he suffered from "delusions, hallucinations, depersonalization or derealization."  King added that the Alabama Department of Corrections records from the years 2002 through 2014 never indicated that Eggers suffered from any kind of psychosis, nor that he was ever treated for any psychosis.  Rather, to the extent Eggers reported mental health issues around the time of his trial in 2002, Dr. King emphasized that two different prison officials said Eggers was malingering

26

psychotic symptoms in an effort to try to get off death row, and that Eggers actually admitted that he was malingering and reported he was going to stop, in his words, "acting crazy."

Dr. King concluded that Eggers "does not have a serious mental illness or mental defect and that he certainly is able to proceed pro se. And he has a rational understanding of courtroom procedures, the issues in the courtroom, and that he has a rational and reasonable understanding of what [it] means to consult with counsel."  King's formal diagnosis of Eggers was narcissistic personality disorder, and, he noted, Drs. Shealy and Hooper's diagnoses at the 2002 trial were essentially the same as his.  He explained that a narcissistic personality disorder "is not considered to be a serious mental illness," and is not a psychotic or a delusional disorder.  The district court accepted Dr. King's opinion, finding it to be supported by the results of the ECST-R, as well as Dr. King's own observations.

After reviewing the competing expert opinions, the district court found that Dr. Benedict's opinion was not supported by the record.  Among other things, the district court expressly found that Benedict could not substantiate the view that Eggers's beliefs are actually delusional -- i.e., that they are falsely-held and persist in the face of evidence to the contrary.  A large portion of the record involved Eggers's longstanding concerns stemming from his role as a confidential informant in 1985.  The record revealed, however, that Eggers was, indeed, a confidential

27

informant at that time and had provided law enforcement with information about "a notorious figure in San Bernardino County known for his connection to the Monks Motorcycle Club and its criminal activities, including drug-dealing, weapons offenses[,] and murder." Thus, as Benedict acknowledged, the danger that Eggers faced as a confidential informant was neither made up nor imagined. Moreover, Eggers subsequently denied that he was still being persecuted by the people he had informed against and reported to Dr. Benedict that he did not believe his attorneys were associated with them.

As for other "delusions," Dr. Benedict had cited to Eggers's belief that ex-parte communications may have occurred between the district court and the United States Supreme Court clerk's office. But, as the district court noted, Eggers disclosed at the hearing that his belief was based on his interpretation of the Supreme Court's filing rules, rather than on some fantastic or impossible scenario. Dr. Benedict also offered Eggers's reports of ill treatment by inmates and prison personnel, through food tampering, threatened violence and physical assault. However, the district court found that no one had presented evidence that this does not go on at prisons. Nor was any evidence presented that any of this had not happened to Eggers.

Dr. Benedict's diagnosis of paranoid schizophrenia was further weakened, the district court found, because Benedict did not offer how Eggers suffered from

28

any of the other symptoms listed in the DSM-V's definition. Dr. Benedict mentioned "brief episodes of disorganized thinking" as a symptom of Eggers's alleged schizophrenia. But, the district court found, Benedict described these episodes as being brief, which suggested they would not meet the DSM-V's requirement that the symptoms be present for at least six months to support a diagnosis of psychosis. Nor did Dr. Benedict testify about the duration of Eggers's negative symptoms. He merely observed that Eggers evinced a strong preference to be housed in isolation and to withdraw from others.

The district court also found that other parts of the record undermined the reliability of Benedict's opinion. In his report, Benedict discounted the prior conflicting mental health evaluations of Drs. Shealy and Hooper -- each of whom had found that Eggers suffered from a personality disorder and nothing more -- observing only that the passage of time provided him with a major advantage in tracking Eggers's symptoms. Again the district court remained unconvinced. It determined that based on a review of all of the documentary evidence, Eggers never displayed clear symptoms of psychosis prior to trial. And, while Dr. Benedict relied on a 1987 police report describing Eggers's mental state after a methamphetamine-fueled road trip, Benedict conceded that Eggers's behavior could have been explained simply by his drug use.

29

Moreover, the district court observed that Eggers had no contact with any mental health authorities over the ten-year period before the murder. And, to the extent Eggers's ADOC medical file reported that he suffered mental health issues around the time of his trial, the file also explained that Eggers was malingering psychosis around the time of his trial in 2002 and 2003, he admitted that fact, and he decided to stop. Specifically, the records reported that Eggers's treatment stopped in 2004 because he said he didn't want to "play crazy anymore." The district court also cited to the correctional records drawn from the period covering 2005 to 2014, which consistently described Eggers as alert, calm, cooperative, normal in affect and thinking, coherent, and without symptoms of anxiety, depression, mania, or psychosis. Nor did these records indicate that Eggers had been on any medication for anxiety or depression for many years.

At the hearing, Benedict was asked about the correctional records from 2007 that described Eggers as being normal in affect and thinking, from 2008 that also described Eggers as being normal and calm and not corroborating psychotic or schizophrenic symptoms or delusions, and finally, those drawn from 2009 that also described Eggers as calm, cooperative, normal in speech and thoughts, and oriented as to time, place, and person. Dr. Benedict did not recall reviewing those records. And when presented with a 2014 report by a psychologist at Donaldson Correctional Facility (Dr. D. Tytell), who had assessed Eggers as being stable and

30

noted that he denied having any problems, Dr. Benedict simply said that he had no reason to doubt that diagnosis. On these more recent records, the district court found no indication that the petitioner was hallucinatory, delusional, aphasic, disoriented, or suffering from any sort of mental instability.[2]

The district court recognized that the results of the MMPI-2 showed "very high levels of paranoia at levels similar to what was indicated by the PAI." However, Dr. King criticized the MMPI-2 results, reasoning that if Eggers's "extraordinarily high" results on some scales of the MMPI-2 were valid Eggers would have evinced "frank and open clear delusions of persecution . . . that would be evident to anybody." Yet Dr. King found no evidence of any such delusions. As for Dr. Benedict's use of the Rorschach ink blot test, the district court relayed that Benedict himself acknowledged the test had been criticized as unreliable.

After reviewing the totality of the evidence, the district court found that Eggers's decision to terminate counsel and waive his appeals was not the product of psychosis. As the district court detailed, Eggers explained to Dr. King that his desire to terminate counsel and waive his appeals was based on his belief that counsel had a political agenda to get rid of the death penalty, and that counsel

---

[2]    Counsel points to a 2012 letter from Eggers requesting a psychological exam; when Dr. Tytell responded to the request, however, he noted that Eggers did not clearly state why he needed an evaluation, and, when Eggers was seen, he apparently wanted to see a psychologist only so that he could be moved to another facility. According to the letter, "[w]hen the Inmate was informed that placement of Inmates was not in the control of the psychologist, the Inmate appeared to have lost interest in dealing with the psychologist."

31

didn't follow his directions and didn't provide him with information when he asked for it. The district court noted, and Dr. Benedict conceded, that Eggers's counsel did not provide him with a copy of a declaration from his ex-wife about his mental state for a period of several months, and that counsel's refusal to turn over the document had been a serious point of contention between them. As Eggers testified, he had learned from talking with his daughter in June 2014 that his ex-wife had provided the declaration to counsel, and when he asked for a copy of it, counsel told him "they didn't have to provide me with any type of evidence whatsoever and I had no right to anything." Eggers also recounted one instance in May 2014 when he had requested copies of all the written requests his lawyers had made to various law enforcement agencies for records, and counsel declined to provide him with any. The district court recognized that Eggers may have been highly suspicious by nature, but reiterated that Dr. Benedict was unable to point to anything that showed Eggers's beliefs were "falsely-held."

The district court also addressed one of Eggers's explanations for why he wanted to abandon his appeal -- because counsel should have pursued different claims than they did, such as claims based on exculpatory documents, and now those claims were unavailable. Eggers testified he was "stuck in an appeal . . . which could go on for years," but that would not address "the issues [he] actually want[ed] resolved." Eggers also perceived that the court system essentially failed

32

him. He asserted that courts don't always do what they should, and that law enforcement will lie "just to insure that a suspect will be found guilty."  But as the district court framed it, while Eggers's beliefs about the court system may have been cynical, they did not amount to a psychotic delusion.

The district court underscored that it had the opportunity to observe Eggers's behavior and demeanor at the hearing, allowed counsel to question Eggers, and found "absolutely nothing" that even remotely suggested mental incompetence or delusional thought processes.  As the district court put it, Eggers "made it clear that he understands his claims, what these proceedings are for, that he was convicted of capital murder, that he was sentenced to death, how the appellate process worked, how the state post-conviction proceedings operated, that he is now in federal habeas corpus proceedings, that his attorneys did not present the claims he wanted them to, and that he does not want to go on to the Eleventh Circuit Court of Appeals."

The district court also recognized that while Eggers had been dissatisfied with the district court's resolution of his earlier pro se habeas claims, whether Eggers's legal opinions about the merits of his case were correct or not, they did not establish his incompetency.  Rather, the question is "whether Eggers's decision to waive his appeal is the product of his rational reasoning or a psychotic delusion."  The district court also determined that Eggers's post-hearing pleadings

33

again established that Eggers truly wanted to withdraw his appeal in its entirety.

When prompted by the district court <u>after</u> the hearing to clarify whether he would

like to appeal in a <u>pro se</u> capacity if he were allowed to do so, Eggers filed a

pleading stating in bold on the first page that he "simply withdraws and waives all

future appeals in their entirety."  Although he continued with twelve pages of

"discussion," he wrote a disclaimer on the first page: "Nothing below voids the

waiver above.  I have meditated about my available legal options, giving them full

serious consideration."  Throughout, Eggers explained, as he had done several

times before, why he wanted to waive his appeals.  He wrote:

> I have often considered how, Bennie Francis Murray's son had been
> placed in a position to explain to his own children "why" they do not
> have a grandmother, recognizing his grief and agonizing pain and
> suffering, which has continued now for fifteen years, passed on from
> generation to generation. . . .
>
> The delays in the process are not beneficial to any party. . . .
>
> My position shall not change until I am executed, but an appeal shall
> not be filed. . . .
>
> Even if the Court granted relief [via a Rule 60(b) motion], the State
> would be free to appeal, again launching me into another
> undetermined time frame. . . .
>
> For the sake of clarity; There will always be a desire to appeal the
> Court's order of dismissal of my <u>pro se</u> claims and procedural bar
> exceptions, but it's not feasible. . . .
>
> Let's move forward eliminating any further undue delays in my
> execution providing the people with justice long overdue. Nobody
> else is to blame, no one should feel guilty granting my request and

prayer for relief. The decision was mine alone to make. Please do not make me beg any more. I simply withdraw and waive all future appeals in their entirety.

On an exceedingly full record, the district court found nothing to suggest that Eggers's mental health "inhibited his current ability to make rational choices with regard to his legal options," and that "Eggers suffers, at most, from a personality disorder and that he is able to make a rational choice among his legal options." The district court offered a reasoned basis for its findings, explaining why it relied on Dr. King's opinion, and the evidence consistent with that opinion, and why it rejected Dr. Benedict's contrary opinion.

C.

To be sure, as Eggers's counsel argues on appeal, there is evidence in the record cutting both ways. The pieces of evidence that counsel has highlighted are no doubt significant, but "[w]e cannot overturn the district court's finding of fact simply because this evidence was merely conflicting." Ga. State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1419 (11th Cir. 1985). While a reasoned factfinder may have reached a different decision, we cannot say that the district court's findings amounted to clear error. Anderson, 470 U.S. at 573–74. They were grounded in the record and copiously detailed.

Counsel's argument on appeal that Dr. King's testing was insufficient to assess Eggers's competence under Lonchar is unpersuasive. For his part, King

35

explained that he chose the ECST-R because he thought it was the most appropriate way to determine whether Eggers had a serious mental illness or mental defect and whether that illness or defect affected his ability to make rational decisions.  While King did not comment on Dr. Benedict's PAI testing, he took issue with the results of Dr. Benedict's MMPI-2 test, and explained that he had abandoned using an MMPI-2 and a test for malingering based on Eggers's conduct throughout the interview.  The long and short of it is that the district court faced a classic "battle of the experts," and was required to make credibility determinations between them.  See, e.g., Wells v. Ortho Pharm. Corp., 788 F.2d 741, 745 (11th Cir. 1986).  And the district court did just that, having reviewed the materials and the testimony offered by each of the experts, weighed the information, and reasonably determined which opinion it found more credible.

Counsel also attacks Dr. King and the district court too for not considering Eggers's entire history.  The first problem with the argument, however, is that in determining competency, the factfinder must make a contemporaneous determination.  Indeed, in Rees itself, the Supreme Court remanded for the lower courts to determine "Rees' mental competence in the present posture of things, that is, whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may

36

substantially affect his capacity in the premises." Rees, 384 U.S. at 314 (1966) (emphasis added); see also Dusky v. United States, 362 U.S. 402, 402 (1960) (The "test must be whether [the petitioner] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him.") (emphasis added). This makes sense, because as it is well established, an inmate's competency could change over the years. See Ford, 195 F.3d at 613 n.8; see also Indiana v. Edwards, 554 U.S. 164, 175 (2008) (holding that mental competency "can vary over time"); Tompkins v. Sec'y, Dep't of Corr., 557 F.3d 1257, 1260 (11th Cir. 2009) ("Mental competency to be executed is measured at the time of execution, not years before then . . . . because mental conditions of prisoners vary over time.").

And in Ford, which addressed the same question before us today -- whether a petitioner was competent to waive his appeal and proceed to execution -- we reviewed a variety of contemporaneous evidence, including Ford's testimony, recent letters, and two recent expert reports. There, the district court had deemed Ford's old trial testimony somewhat irrelevant, and we nevertheless affirmed the district court's finding of competency, observing that "[the court] was charged with evaluating Ford's current competence in 1998, as opposed to Ford's competence at the time of trial in 1984." Ford, 195 F.3d at 622 n.13; see also

Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1259 (11th Cir. 2002) (holding that an inmate's "incompetency to stand trial seven and eight months [after trial], like his incompetency to stand trial seventeen years earlier, is relevant, but it is not enough to counter the best evidence of what his mental condition was at the only time that counts, which is the time of the trial. The best evidence of Wright's mental state at the time of trial is the evidence of his behavior around that time . . . .").

In the face of this caselaw, we cannot fault the district court, nor Dr. King for that matter, for relying more heavily on recent evidence in assessing Eggers's competency.  As the district court explained:

> While Dr. Benedict relied heavily on reports by friends and family members who told him things like Eggers once reported "hearing voices;" he "became 'paranoid' after Federal officers had him become an informant;" he talked "about bikers and the Mexican mafia being after him;" and he seemed to have symptoms of paranoid schizophrenia like his brother; these accounts describe events that allegedly occurred years before his crime and nearly thirty years ago. The Court declines to give these non-contemporaneous accounts much weight, given that Eggers's medical records show a finding of malingering and the absence of any subsequent delusions or hallucinations.

Similarly, Dr. King admitted that he had reviewed Dr. Benedict's report when he was preparing his own -- and Dr. Benedict's report contained much of the historical evidence that counsel now relies upon -- and Dr. King rejected the notion that the additional facts he was presented on cross-examination would have

38

changed his opinion.  Moreover, while Dr. Benedict did interview several of

Eggers's friends and family members, it is unclear from his report how much

recent contact these individuals had with Eggers.  Aside from his brother Carl's

statement that Eggers seemed "paranoid in prison," much of the report described

the friends' and family members' impressions of Eggers sometime before his

lengthy incarceration.

In any event, the record shows that the district court actually considered all

of the available evidence in making its findings.  Not only did the district court

detail its review, but made this additional observation:

> The record before the Court is the entire record on federal habeas
> review in this action. However, this section sets out and comments
> upon only the parts of the record that the Court deems relevant to the
> issue to be decided, i.e., whether Eggers is currently competent to
> waive his appeal, dismiss his attorneys, and proceed to execution.
> The Court has taken the entire record into consideration, however, in
> making its determination.

The district court said it had considered the "entire record," and its opinion bore

out the breadth of its review.

Counsel also faults the district court for failing to fully appreciate Eggers's

"delusions" stemming from his work as a confidential informant in 1985.  It is

undeniable that Eggers's concern over this issue did not end.  It is also undeniable,

however, that Eggers's concerns were at least loosely based on events that actually

occurred.  Counsel points to the affidavit from Eggers's ex-wife, who had served

39

as a confidential informant with him, and said that she did not "perceive any threat of retaliation from any target of their cooperation, from the Monks Motorcycle Club, or from the Mexican Mafia." But counsel fails to convince us that one version of events is compelled over the other, or that Eggers's reaction to his experience was delusional based simply on a comparison to his ex-wife's reaction. What's more, Eggers admitted that he had delusions at the time of the crime, and had "trouble being able to identify victims or victimization conspirators," but that he now believes "he is not currently the victim of motorcycle gangs or the Mexican mafia, and that he has not been for years." And to the extent he still holds onto certain ideas, counsel has not delineated how much paranoia is "too much," or how the district court is expected to make this kind of calculus.

Indeed, in Ford, we held that even though Ford had made statements about "the 'Holy Trinity' and having . . . wives, travels, and bank accounts [in heaven]," so long as the experts and the district court considered these factors, the district court did not clearly err in finding that Ford was competent under Lonchar. See Ford, 195 F.3d at 622. Similarly, the record before us supports the finding that even if Eggers continued to discuss his "conspiracy theories," he nevertheless had "rational reasons for choosing to die," and plainly understood that "in his legal situation, he must choose either to continue his legal challenges or be executed." See Hauser, 223 F.3d at 1322–23 (quoting Ford, 195 F.3d at 615).

40

Counsel further claims that Eggers's statements and most recent legal filings -- where he complained about counsel waiving his arguments while nevertheless maintaining that he wanted to forego his appeal -- suggested that he was incapable of making a rational choice.  But the record shows that when the district court asked him after the hearing whether he would like to appeal in a pro se capacity if allowed to do so, he clearly responded that while he would "always" have a "desire to appeal the Court's order of dismissal of [his] pro se claims and procedural bar exceptions, . . . it's not feasible. . . . Let's move forward eliminating any further undue delays in my execution providing the people with justice long overdue."

Similarly, in his later pro se letter to this Court, Eggers said the district court's competency ruling was not clearly erroneous, and while he repeated at length the claims he faulted his counsel for abandoning, he made clear that if the Court will not pursue these claims, the Court should "issue an immediate order finding Eggers's waiver of all future appeals valid, removing the stay of execution, authorizing the State of Alabama to move forward with Eggers['s] state sanctioned execution."  And in an even more recent filing to the United States Supreme Court, Eggers took issue with our Court's process, but nevertheless made the same unambiguous request -- that his "execution and sentence of death . . . be carried out immediately."  We can discern no clear error in the district court's finding that Eggers has chosen to abandon his appeal.

41

The suggestion that Eggers's choice to forego his appeals and be executed, resulting from his unhappiness with the legal proceedings, must make him mentally incompetent likewise is unpersuasive. While Eggers's situation is undoubtedly sad, his dissatisfaction with the legal system is a not novel one. As Dr. King observed, and the district court found, just because an inmate may disagree with counsel or with a ruling court does not yield a conclusion that the inmate is psychotic or delusional. Regardless, Eggers said in recent filings that he wanted to waive his appeals because it was futile to continue with them, that he was seeking justice for himself and for the family members of the homicide victim, and that he believed there wasn't any reason to continue on with the litigation. On this record, we cannot say that the district court clearly erred in finding that Eggers understood "the 'bottom line' of his legal situation -- that he must continue to engage in the review process or be executed -- [in order to be] able to make a rational choice among these options." Henderson v. Campbell, 353 F.3d 880, 894 (11th Cir. 2003) (quotation omitted); Hauser, 223 F.3d at 1323; Ford, 195 F.3d at 615.

The district court's job as the finder of fact was to determine "whether a mental disease, disorder, or defect prevents [Eggers] from making a rational choice among his options." Lonchar, 978 F.2d at 641. Our task is to discern whether the district court clearly erred in its findings. As we've noted, the district court's

42

findings were grounded in an ample record.  And the law is well settled that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  Anderson, 470 U.S. at 573-74.  Again, we may reverse the district court's findings only when "on the entire evidence" we are "left with the definite and firm conviction that a mistake has been committed."  Id. at 573 (marks and citation omitted).  We are left with no such conviction.

In short, the district court did not clearly err in finding Eggers competent to proceed in the case.  The district court could find as it did that Eggers was entitled to abandon his appeals, dismiss counsel and proceed to execution.  See Ford, 195 F.3d at 605 n.11 (If the "district court's finding that Ford is mentally competent is not clearly erroneous, then the district court correctly honored Ford's wishes to dismiss his attorney and his § 2254 habeas petition.").  Thus, there is no longer any live controversy between Eggers and the respondent.  We vacate our stay, and dismiss both appeals for lack of jurisdiction.  See id.

**AFFIRMED AND DISMISSED; STAY VACATED.**